**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **24-cr-404 (APM)** |
| **DIMITRI SIMES, and** | : | |
| | : | |
| **ANASTASIA SIMES,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby files its opposition to Defendants Dimitri Simes and Anastasia Simes's Motion to Dismiss the Indictment ("Defs.' Mot.") (ECF 10). Defendants' motion asks this Court to rule on the merits of their motion while Defendants refuse to submit to the Court's jurisdiction. Such a "heads I win, tails you lose" maneuver, if successful, would open this Court's docket for all fugitive defendants to seek the same relief. Defendants should not be allowed "to have [their] cake and eat it, too." *United States v. Osipov*, No. 22-cr-369-TSC-ZMF, 2024 WL 4367523, \*1 (D.D.C. Oct. 1, 2024), adopted by Judge Chutkan in her Opinion and Order dated April 29, 2026 (1:22-cr-00369-TSC, ECF 38) ("Osipov Op. & Order").

Defendants must present themselves before this Court in the District of Columbia to pursue their challenges to the criminal charges. Where, as here, Defendants have remained overseas, outside the jurisdiction of this Court, despite knowing they are under criminal indictment, they are functional fugitives and should be barred from litigating their claims under the fugitive disentitlement doctrine. Such a finding is particularly warranted here where Defendants are U.S. citizens, own property in the United States, resided in the United States during the time frame of

1

the alleged criminal conduct, and have remained in Russia to evade prosecution. Defendants'

Motion should be denied without prejudice.[1]

**LEGAL BACKGROUND ON CHARGES**

The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50,

United States Code, Sections 1701-1708, confers upon the President authority to deal with unusual

and extraordinary threats to the national security and foreign policy of the United States. Section

1705 provides, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate,

conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued

under this chapter." 50 U.S.C. § 1705(a), (c).

On April 15, 2021, pursuant to IEEPA, the President issued Executive Order ("E.O.")

14024, which declared a national emergency with respect to certain harmful foreign activities

undertaken by the Russian Federation. To address this national emergency, the President blocked

all property and interests in property that were then or thereafter came within the United States or

the possession or control of any U.S. person or of individuals determined by the Secretary of the

Treasury or the Secretary of State to meet one or more enumerated criteria, including persons and

entities determined to be controlled or owned by, or to have acted or purported to act for or on

behalf of, directly or indirectly, the Government of Russia.

To implement E.O. 14024, the U.S. Department of the Treasury's Office of Foreign Assets

Control ("OFAC") issued the "Russian Harmful Foreign Activities Sanctions Regulations," 31

C.F.R. Part 587. *See* 86 Fed. Reg. 20,249. The regulations provide that the names of persons

---

[1] Defendants make a number of substantive claims about the charges in the indictment. *See* ECF 10-1 at 1-4 & 25-36. Given the government's position on the application of the fugitive disentitlement doctrine, the government is not responding to those arguments but reserves the right to do so at a later date should the Court so order.

designated by OFAC pursuant to E.O. 14024, and whose property and interests in property are therefore blocked, are published in the Federal Register and incorporated into the Specially Designated Nationals and Blocked Persons List ("SDN List"), which is published on OFAC's website. *See* 31 C.F.R. § 587.201, Note 1.

E.O. 14024 prohibits, among other things, U.S. persons from transferring, paying, exporting, withdrawing, or otherwise dealing in the property or interests in property of a designated person identified on the SDN List. E.O. 14024 § 1. These prohibitions include the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of, or the receipt of funds, goods, or services from, a designated person identified on the SDN List. *Id.* § 2. Any transaction that evades or avoids, or has the purpose of evading or avoiding, or causes a violation of E.O. 14024 is further prohibited. *Id*. § 4.

As defined, "property" and "property interest" include, but are not limited to, money, checks, drafts, bullion, bank deposits, debts, evidences of title, ownership, or indebtedness, services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interests therein, present, future, or contingent. 31 C.F.R. § 587.311.

"U.S. person" is defined as a United States citizen, lawful permanent resident, entity organized under the law of the United State or any jurisdiction within the United States (including foreign branches), or any person in the United States. 31 C.F.R. § 587.314.

On May 8, 2022, following Russia's full-scale, unprovoked invasion of Ukraine, OFAC designated Joint Stock Company ("JSC") Channel One Russia ("Channel One Russia") pursuant to E.O. 14024 for being owned or controlled by, or for having acted or purported to act for or on behalf of, directly or indirectly, the government of Russia. On December 15, 2022, OFAC

designated JSC Rosbank ("Rosbank"), a Russian bank, pursuant to E.O. 14024 for operating in the financial services sector of the Russian Federation economy.

Since May 8, 2022, and December 15, 2022, it has been a violation of IEEPA for a U.S. person to transact with Channel One Russia or Rosbank, respectively, without authorization from OFAC in the form of a license. 50 U.S.C. § 1705(a); E.O. 14024 § 1; 31 C.F.R., Part 587.

## **FACTUAL BACKGROUND**

Defendants are both dual U.S.-Russian nationals. Dimitri Simes immigrated to the United States in 1973. Since June 2021, Defendants have owned a residence in Huntly, Virginia. In or around September 2022, Dimitri Simes obtained Russian citizenship. ECF 1 at 3. He has taken no formal action to renounce his U.S. citizenship, *id*., and in fact reasserts and confirms his U.S. citizenship throughout Defendants' memorandum in support of their motion. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss, ECF 10-1 ("Defs.' Mem."), at 1, 5, 13, 14, 18, 19, 23, 24, 25, 26, 29, 31, and 36; *but see id*. at 20 ("All the Simes assert is 'the right of *a foreign defendant* who did not flee the United States'") (emphasis added).

Defendant Dimitri Simes left the United States in October 2022 and has not returned since. ECF 1 at 3. Based on a review of travel records, Defendant Anastasia Simes traveled to the United States six times between July 2020 and April 2024. She last resided in the United States from approximately February 15, 2024, to April 17, 2024. *Id*.

On September 5, 2024, the Grand Jury indicted Defendants with one count of Conspiracy to Violate IEEPA, in violation of 50 U.S.C. § 1705; one count of violating IEEPA, in violation of

50 U.S.C. § 1705; and one count of international money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).[2] *See* ECF 1. The indictment was unsealed on September 5, 2024.

As alleged in the Indictment, beginning no later than June 2022 and continuing through early September 2024, Defendants and others engaged in a scheme to violate IEEPA by providing services to and for the benefit of, and receiving funds from, Channel One Russia, which had been sanctioned by OFAC. *Id*. at 1-2. Defendants and others further conspired to transfer the funds from Rosbank, which also had been sanctioned by OFAC, through Armenia, to the United States to conceal and disguise the nature, location, source, ownership, and control of the proceeds. *Id*. at 2.

Specifically, after OFAC sanctioned Channel One Russia on May 8, 2022, Defendant Dimitri Simes, a U.S. citizen, continued to provide services, including hosting and producing the television program "The Great Game" for Channel One Russia, and received compensation and services from Channel One Russia, knowing that it was unlawful to do so. As part of his compensation, Channel One Russia agreed to provide Defendant Dimitri Simes with, among other things, business class tickets to and from Washington, D.C., and Moscow, Russia. *Id*. at 2 & 5.

In total, Defendant Dimitri Simes received over $1 million in monthly salary payments from Channel One Russia from May 2022, when it was sanctioned by OFAC, to the date of the indictment. *Id*. at 5-6. The payments were made to an account at Russian Rosbank. Then, to conceal the origin of the funds, the funds were transferred to an Armenian financial institution (referred to as "Armenian Financial Institution 1" in the indictment) and then transferred to

---

[2] Defendant Anastasia Simes was also charged in a separate indictment with one count of Conspiracy to Violate IEEPA, in violation of 50 U.S.C. § 1705; one count of violating IEEPA, in violation of 50 U.S.C. § 1705; and one count of international money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). Case no. 24-cr-403, ECF 1. She filed a motion to dismiss in that case as well, making similar arguments as made in Defendants' Motion. *See* Case no. 24-cr-403, ECF 10. The Court may find that consolidating the cases for purposes of these motions promotes judicial efficiency.

accounts at a U.S. financial institution (referred to as "U.S. Financial Institution 1" in the indictment) that were jointly owned by Defendants. *Id*. at 8.

After OFAC added Channel One Russia to the SDN List in May 2022, Defendant Dimitri Simes acknowledged the imposition of U.S. sanctions on Channel One Russia and the consequences of violating such sanctions. Defendant Dimitri Simes told Channel One Russia's Deputy General Director (referred to as "Individual 1" in the indictment) that the United States had imposed sanctions against Russian television channels, including Channel One Russia. Defendant Dimitri Simes told Individual 1 that he understood that because of these sanctions, he had "absolutely no right to appear on federal channels. Even for free, even just in the format of an interview. Moreover, a violation is considered a criminal offense." *Id*. at 6.

In May 2022, Defendant Dimitri Simes wrote Individual 1 that the imposition of sanctions on Channel One Russia "makes it impossible for federal channels to operate in the United States. It also prohibits U.S. citizens and residents from providing services to channels, even if the services are limited to interviews and are provided free of charge." *Id*. In June 2022, Defendant Dimitri Simes told Individual 1 that working for Channel One Russia without a license could "create problems." *Id*. at 6-7. Similarly, in August 2022, Defendant Anastasia Simes acknowledged that Channel One Russia was "under sanctions." *Id*. at 7.

On or about June 30, 2022, despite his knowledge of the sanctions and the consequences of violating those sanctions, and despite not having obtained a license from OFAC, Defendant Dimitri Simes told Individual 1 he was ready to immediately return to his duties as a host on Channel One Russia. On or about July 4, 2022, Defendant Dimitri Simes hosted "The Great Grune" on Channel One Russia. He continued to do so on a weekly basis until at least in or around August 2024. *Id*. at 8-9.

Defendant Dimitri Simes received funds from Channel One Russia at a Rosbank account, including after OFAC sanctioned Rosbank on December 15, 2022, in addition to accounts at other financial institutions. Defendants transferred a portion of the Channel One Russia funds from Rosbank to an account held by Defendants in the United States through Armenian Financial Institution 1, an intermediary financial institution in Armenia. Among other things, Defendants used the funds received from Channel One Russia to pay for property in the United States (their house in Huntly, VA). At no time did Defendants disclose their activities involving Channel One Russia and Rosbank to, or obtain approval for such activities from, OFAC, which is located in the District of Columbia. *Id*. at 1.

Defendants have not entered an appearance or otherwise submitted to the jurisdiction of this Court. On May 4, 2026, Defendants moved to dismiss the Indictment, arguing that they are entitled to make their claims without submitting to the Court's jurisdiction. Defs.' Mem. at 14-25. Additionally, Defendants make a number of substantive claims as to why the charges should be dismissed. *See id*. at 1-4 & 25-36. As noted above at n.1, the government is only addressing Defendants' argument that they are not "fugitives" pursuant to Fugitive Disentitlement Doctrine (the "Doctrine"). To address Defendants' substantive claims at this stage would defeat the purposes of the Doctrine.

## ARGUMENT

**Defendants Are Not Entitled to a Ruling on the Merits of the Motion Because They Have Not Submitted to this Court's Jurisdiction.**

The Doctrine dates back at least to an 1876 United States Supreme Court case, the reasoning of which remains instructive today:

> It is clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render. In this case it is admitted that the plaintiff in error has

escaped, and is not within the control of the court below, either actually, by being in custody, or constructively, by being out on bail. If we affirm the judgment, he is not likely to appear to submit to his sentence. If we reverse it and order a new trial, he will appear or not, as he may consider most for his interest. Under such circumstances, we are not inclined to hear and decide what may prove to be only a moot case.

*Smith v. United States*, 94 U.S. 97, 97 (1876).

Here, Defendants have given no assurances, nor could they, that they will return to face prosecution under the indictment if the Court denies their motion to dismiss. Indeed, Defendants have given every indication that they will not do so. This Court should not expend its (and the government's) resources to hear what may only prove to be a moot motion. Defendants' motion should be denied.

## I. Legal Standards

### A. General Principles

"What is known loosely as the fugitive disentitlement doctrine generally permits a federal court to insist on a defendant's presence in the jurisdiction before it resolves challenges to the criminal charges." *Osipov*, 2024 WL 4367523 at *2 (quoting *United States v. Martirossian*, 917 F.3d 883, 885 (6th Cir. 2019)). "[T]he doctrine has come to signify the unwillingness of courts to waste time and resources exercising jurisdiction over litigants who will only comply with favorable rulings of the court." *United States v. Bokhari*, 993 F. Supp. 2d 936, 938 (E.D. Wis.), *aff'd on other grounds*, 757 F.3d 664 (7th Cir. 2014) (citations and internal quotation marks omitted).

Under the Doctrine, a defendant may not seek an advantageous ruling from a court without submitting himself to its jurisdiction, including the consequences of a disadvantageous ruling if the court holds against him. The alternative would mean that a defendant could call upon the resources of a court and then freely flout the court's decision if it denied him the relief he sought, in defiance of the integrity due the court and the judicial process. *See Smith*, 94 U.S. at 97 ("It is

8

clearly within our discretion to refuse to hear a criminal case in error, unless the convicted party, suing out the writ, is where he can be made to respond to any judgment we may render.").

In the appellate context, and as applied by the Supreme Court, the Doctrine "has rested in part on enforceability concerns, and in part on a 'disentitlement' theory that construes a defendant's flight during the pendency of his appeal as tantamount to waiver or abandonment." *Ortega-Rodriguez v. United States*, 507 U.S. 234, 240 (1993). "The doctrine exists to encourage compliance with the law and to protect against defendants that attempt to invoke from a safe distance only so much of a United States court's jurisdiction as might secure a dismissal while carefully shielding himself from the possibility of a penal sanction." *Osipov*, 2024 WL 4367523 at *2 (quoting *United States v. Türkiye Halk Bankasi A.S.*, 426 F. Supp. 3d 23, 40–41 (S.D.N.Y. 2019) (other citation omitted) (cleaned up)).

### B. *Application of the Doctrine to Pretrial Motions*

While the D.C. Circuit has yet to rule on the applicability of the Doctrine to pretrial motions such as the instant motion, other district courts have routinely adopted the practice of applying the doctrine in this context. *See, e.g., Martirossian*, 917 F.3d at 890 ("district court did not violate any clear and indisputable authority in" denying defendant's motion to dismiss the indictment and "reasonably held that the fugitive disentitlement doctrine applies to actual flight and constructive flight"); *United States v. Besarovic*, No. 2:12-CR-0004-APG-GWF, 2017 WL 6762479, at *2 (D. Nev. Oct. 5, 2017) (denying defendant's motion for partial dismissal based on the fugitive disentitlement doctrine, reasoning that "Defendant is obviously aware of the criminal charges against him, but refuses to present himself in this jurisdiction to answer to those charges"), *report and recommendation adopted*, No. 2:12-CR-0004-APG-GWF, 2018 WL 272173 (D. Nev. Jan. 2, 2018); *United States v. Bakri*, No. 3:00-CR-76-TAV-CCS-2, 2014 WL 1745659, at *2 (E.D. Tenn.

9

Apr. 30, 2014) (denying motion to dismiss indictment based on application of the fugitive disentitlement doctrine); *Bokhari,* 993 F.Supp. 2d at 938 (finding that "[c]ourts have applied the doctrine, as here, to pretrial motions in criminal cases") (citations omitted); *United States v. Chung Cheng Yeh,* No. CR 10–00231 WHA, 2013 WL 2146572, at *3 (N.D.Cal. May 15, 2013) (same); *United States v. Kashamu,* 656 F.Supp.2d 863, 867 (N.D. Ill. 2009) (holding "that the fugitive disentitlement doctrine can apply to pretrial motions in criminal cases, subject to the discretion of the Court"); *United States v. Oliveri,* 190 F.Supp.2d 933, 936 (S.D.Tex.2001) (recognizing that "[a]lthough the fugitive disentitlement doctrine is often invoked during the appellate process, it also applies to pretrial motions made by fugitives in the district courts"); *United States v. Stanzione,* 391 F.Supp. 1201, 1202 (S.D.N.Y.1975) (applying the doctrine and refusing to hear the defendant's motion to dismiss the indictment until he submits to the jurisdiction of the court for full resolution of the case).

Moreover, courts have applied the Doctrine to "foreign defendants who are in their home countries when indicted and 'refuse to answer an indictment or arrest warrant after they issue.'" Osipov Op. & Order at 2 (quoting *Martirossian*, 917 F.3d at 890; then citing *United States v. Shalhoub*, 855 F.3d 1255, 1264 (11th Cir. 2017) (district court did not clearly abuse its discretion by applying fugitive disentitlement to Saudi Arabian defendant who "knew of the indictment and refused to surrender himself to the jurisdiction of the court, electing instead not to travel outside Saudi Arabia to avoid apprehension" (cleaned up)); *see also United States v. Bardakova*, 145 F.4th 231, 245 (2d Cir. 2025) (applying Doctrine to Russian national who had committed crimes while in the United States and remained abroad at least in part to avoid prosecution).[3]

---

[3] As discussed below, Defendants rely on *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2022), but fail to address more recent Second Circuit precedent in *Bardakova*, 145 F.4th 231.

10

Although Defendants are dual U.S.-Russian nationals, and not solely foreign nationals, U.S. Magistrate Judge Zia M. Faruqui's well-reasoned opinion in *Osipov*, which was adopted by U.S. District Judge Tanya S. Chutkan in her own well-reasoned opinion, is instructive here. In *Osipov*, the defendant, a Russian national, was indicted in 2022 for conspiracy, IEEPA, and money laundering crimes. Osipov did not submit to U.S. authorities but instead moved to dismiss the indictment while residing in Switzerland, a country that would not extradite him. *Osipov*, 2024 WL 4367523 at *1. The motion was referred to Judge Faruqui, who issued a report and recommendation that the motion be dismissed. *Id*. Judge Chutkan adopted that report and recommendation and dismissed the defendant's motion without prejudice. Osipov Op. & Order at 1.

Judge Faruqui "adopt[ed] the reasoning of the Sixth and Seventh Circuits" and concluded that the Doctrine "applies to foreign defendants who refuse to appear." *Osipov*, 2024 WL 4367523 at *3. As Judge Faruqui reasoned, "'The purposes behind the doctrine apply in both settings,' i.e., regardless of whether a defendant flees the United States or simply refuses to appear." *Id*. (quoting *Martirossian*, 917 F.3d at 890; then citing *Ortega-Rodriguez*, 507 U.S. at 242). As Judge Chutkan opined, "Federal courts do not play 'heads I win, tails you'll never catch me.' 'If a defendant refuses to show up to answer an indictment . . . , the court may decline to resolve any objections to the indictment in his absence.'" Osipov Op. & Order at 1 (quoting *Martirossian*, 917 F.3d at 885) (alteration in original).

Judge Faruqui reasoned that Osipov was a fugitive because "despite knowledge of the indictment and superseding indictment, Osipov has yet to submit himself to the jurisdiction of this Court in the nearly two years that have followed." *Osipov*, 2024 WL 4367523 at *4 (citing the indictment). Osipov argued that he was "not a fugitive because he did not flee the United States

and instead 'merely . . . remained in his home country' of Switzerland." Osipov Op. & Order at 2. (quoting Def.'s Objs. at 1, ECF No. 33). Judge Chutkan disagreed and held that the defendant was a "constructive fugitive." Osipov Op. & Order at 2. "Constructive fugitives are litigants who, like Osipov, do not surrender themselves to law enforcement authorities upon learning of an indictment. A defendant need not be present in and leave a jurisdiction to become a fugitive; the mere refusal to report for prosecution can constitute constructive flight." *Id*. (quoting *Martirossian*, 917 F.3d at 890; then citing *Shalhoub*, 855 F.3d at 1263) (cleaned up). As discussed below, Judge Chutkan's and Judge Faruqui's reasoning in *Osipov* applies with equal force here.

## II.      Defendants Are Fugitives.

Defendants dispute that they are "fugitives" within the meaning of the Doctrine, relying heavily on *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2022); *United States v. Any & all Funds on Deposit in Acct. No. XXXXX-XXXXXXX at HSBC Bank PLC, 55 Corp. St., Coventry, United Kingdom ("Any & all Funds")*, 87 F. Supp. 3d 163 (D.D.C. 2015); and *In re Hijazi*, 589 F.3d 401 (7th Cir. 2009). *See* Defs.' Mem. at 15-22. As detailed below, Defendants' arguments are meritless.

### A. *Defendants Are Constructive Fugitives.*

Under the applicable case law, Defendants are constructive fugitives. Defendants are aware of the indictment against them. And yet, they have remained in Russia and have failed to surrender to U.S. authorities. They thus are constructive fugitives. *See Martirossian*, 917 F.3d at 890; *Shalhoub*, 855 F.3d at 1263; Osipov Op. & Order at 2; *Osipov*, 2024 WL 4367523 at *4; *Oliveri*, 190 F. Supp. 2d at 936 (holding that defendant who was aware of the charges pending against him and purposely absenting himself from the United States to avoid arrest and arraignment on the charges is a fugitive); *see also Bardakova*, 145 F.4th 245 ("because Bardakova allegedly

12

committed crimes while in the United States but was in Russia when she learned that her arrest was sought, and because we can infer from the circumstances that she remains abroad at least in part to avoid prosecution, she meets the common-law definition of a constructive-flight fugitive"); *In re Kashamu*, 769 F.3d 490, 493 (7th Cir. 2014) (in ruling against petition for mandamus on Speedy Trial Act issue, the circuit court cited noted that the defendant, a foreign national who had never been to the United States "was functionally a fugitive" because he knew he was under indictment and, rather than come to the United States to face the charges, he "fought tooth and nail" to avoid extradition) (citations omitted).

### B. The Cases Relied on by Defendants Are Easily Distinguishable.

The cases cited by Defendants on this issue are easily distinguishable. First, unlike the claimant in *Any & all Funds*, 87 F. Supp. 3d at 165, Defendants are seeking to dismiss a criminal indictment, not a civil forfeiture action. *Cf. Any & all Funds*, 87 F. Supp. 3d at 165, 168 (holding that claim may be pursued in civil forfeiture action by "a Thai native who has never lived in the United States").

Second, unlike the defendants in *Bescond*, 24 F.4th 759, and many of the other cases they cite, Defendants "are American citizens," Defs.'s Mem. at 1, who lived in the United States for many years, own property here, and resided in the United States within the time frame of the charged conduct, which includes two alleged international conspiracies and substantive IEEPA violations from approximately June 2022 to September 2024. *Cf. Bescond*, 24 F.4th at 772 (defendant, a citizen and resident of France, held not to be a "fugitive" under the Doctrine where she "was not in the United States while allegedly committing the charged conduct" and was not

"refusing to return to the United States to avoid prosecution");[4] *Hijazi*, 589 F.3d at 403, 412-14 (defendant, a Lebanese citizen and resident of Kuwait, held not to be a fugitive where he had no connections to the United States and had surrendered to Kuwaiti authorities); *United States v. Golden*, 239 F.2d 877, 878 (2d Cir. 1956) (defendant, who resided in Thailand, allegedly had renounced his United States citizenship and thereby "ceased to be a citizen and national of the United States"); *United States v. Cornelson*, 595 F. Supp. 3d 265, 267, 270-71 (S.D.N.Y. 2022) (defendant, a Brazilian citizen residing in Brazil who was not in the United States when he committed the alleged crimes and had not refused to return to the United States to avoid prosecution, held not to be a constructive fugitive).

### C. Defendants Ignore and Misread Caselaw from Other Circuits That Supports the Government's Position.

As addressed above, caselaw from the Second, Sixth, Seventh, and Eleventh Circuits and numerous district courts supports the government's position in this case. Defendants ignore recent Second Circuit and Eleventh Circuit precedent and misread caselaw from the Sixth Circuit in

---

[4] Defendants are fugitives even under the common-law definition of a constructive-flight fugitive used by the Second Circuit: they resided in the United States during the time frame of the charged conduct (June 2022 to October 2022 for Defendant Dimitri Simes and various times from June 2022 to April 2024 for Defendant Anastasia Simes) but were in Russia when they learned that their arrest was sought, and the Court can infer from the circumstances that they remain abroad at least in part to avoid prosecution. *See Bardakova*, 145 F. 4th at 245. As Defendants aver in support of their motion, "The Indictment of the Simes has exiled an American journalist to the very country from which [Dimitri Simes] took refuge a half-century ago." Defs.' Mem. at 14. Moreover, Defendants "reside[] openly in Moscow," Russia, Defs.' Mem. at 17, a country with which the United States does not have an extradition treaty. In an interview with a reporter for RT INTERNATIONAL, published soon after the indictment was unsealed in September 2024, in response to the question, "Will you and your wife try to fight the charges in an American court," Dimitri Simes replied, "I will have to discuss this with my lawyers and until I have spoken to them in detail I will of course not make any decisions. If we have to come to the United States to contest the charges, then no, I am not in the least tempted to do so." Elena Chernenko, "'*Biden is out to get me': A Russian-American TV host facing 60 years in a US jail speaks out*," RT INTERNATIONAL (Sept. 9, 2024), available at https://www.rt.com/news/603734-biden-is-out-to-get-me/ (last accessed May 11, 2026). Clearly, Defendants remain in Russia at least in part to avoid prosecution.

arguing that, in *Osipov*, 2024 WL 4367523, Judge Faruqui "created an acknowledged circuit split with published, thoroughly reasoned decisions from the Second Circuit in *Bescond* and the Seventh Circuit in *Hijazi* for reasons that do not withstand scrutiny." Defs.' Mem. at 16.

First, Defendants' reliance on *Any & all Funds*, *see* Defs.' Mem. at 15-16, is not only misplaced but also misleading. In *Any & all Funds*, U.S. District Judge Christopher R. Cooper was interpreting the provisions of 28 U.S.C. § 2466. 87 F. Supp. 3d at 167-68. Section 2466, which is part of the Civil Asset Forfeiture Reform Act, applies only to forfeiture proceedings. 18 U.S.C. § 2466(a). Its requirements do not concern the application of the common law Doctrine to a motion to dismiss a criminal indictment. In any event, as discussed below, the government believes that Defendants have "otherwise evade[d] the jurisdiction of the court in which a criminal case is pending against [them]." *Cf.* 18 U.S.C. § 2466(a)(1)(C).

Second, Defendants cite *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2022), but fail to address more recent Second Circuit precedent such as *Bardakova*, 145 F.4th 231. In *Bardakova*, the Second Circuit applied the Doctrine to a Russian national who had committed crimes while in the United States, finding that "because Bardakova allegedly committed crimes while in the United States but was in Russia when she learned that her arrest was sought, and because we can infer from the circumstances that she remains abroad at least in part to avoid prosecution, she meets the common-law definition of a constructive-flight fugitive." 145 F. 4th at 245. Such reasoning would also apply here. Defendants are alleged to have resided in the United States during the time frame of the charged conduct (consisting of two international conspiracies and a substantive IEEPA count that took place from approximately June 2022 to September 2024) but were in Russia when they learned that their arrest was sought, and the Court can infer from the circumstances that they

remain abroad at least in part to avoid prosecution.[5] Defendants also fail to address current Eleventh Circuit case law such as *United States v. Shalhoub*, 855 F.3d 1255, discussed above.

Third, Defendants misread *Martirossian*, 917 F.3d 890, claiming that "the only issue before the Court was whether the district court's decision to hold trial proceedings in abeyance was an appealable order." Defs.' Mem. at 16. In ruling on this issue, the Sixth Circuit necessarily had to opine on the district court's authority to apply the Doctrine. The Sixth Circuit thus held,

> The district court did not violate any clear and indisputable authority in taking this route. It reasonably held that the fugitive disentitlement doctrine applies to actual flight and constructive flight, in other words (1) to defendants who leave the country before or after an indictment to evade justice or (2) to defendants who refuse to answer an indictment or arrest warrant after they issue.

*Martirossian*, 917 F.3d at 890. The Sixth Circuit further noted, "We know of no case that bars applying it in both settings to pending criminal charges. The purposes behind the doctrine apply in both settings." *Id*. (citing *Ortega-Rodriguez*, 507 U.S. at 242). As the Sixth Circuit reasoned, "[T]he doctrine promotes judicial economy because it frees judges from giving what amount to advisory opinions that are unlikely to be enforced if the court rules against the fugitive." 917 F.3d at 890. The Court noted that the Sixth Circuit had "applied the doctrine to litigants who, like Martirossian, do not surrender themselves to law enforcement authorities" and reasoned that "a defendant need not be present in and leave a jurisdiction to become a fugitive; the mere refusal to report for prosecution can constitute constructive flight." *Id*. (citations omitted). The same logic applies here.

---

[5] The Second Circuit distinguished the facts in *Bescond*, noting, "Bardakova's alleged domestic conduct distinguishes her from defendants whom courts have not considered fugitives—namely, *foreign nationals indicted for conduct that occurred entirely abroad*." 145 F.4th at 242 (citing *Bescond*, 24 F.4th at 772) (emphasis added).

Fourth, Defendants also misread caselaw from within the Seventh Circuit. It is true that in *In re Kashamu*, the issue before the Seventh Circuit was a petition for mandamus relating to a motion the defendant had filed in the district court "to dismiss the indictment against him on the alternative grounds that the court has no personal jurisdiction over him because he's never been in the United States … and that the speedy-trial clause of the Sixth Amendment bars his prosecution." 769 F.3d at 492. At the same time, the Seventh Circuit underwent a similar analysis as is done under the Doctrine, reasoning that the defendant, a foreign national who had never been to the United States "was functionally a fugitive" because he knew he was under indictment and, rather than come to the United States to face the charges, he "fought tooth and nail" to avoid extradition. *Id*. at 493 (citing *Bokhari,* 757 F.3d at 672; then citing *United States v. Marshall,* 856 F.2d 896, 898 (7th Cir.1988)); *see also Bokhari*, 993 F.Supp. 2d at 937.

In *Bokhari*, from a court within the Seventh Circuit, the District Court reasoned,

> "Fleeing from justice does not, as the words literally connote, mean a person 'on the run.' ... Fleeing from justice is not always a physical act; it may be a state of mind. When a person purposely leaves the jurisdiction or decides not to return to it, in order to avoid prosecution, he is a fugitive." *United States v. Eng*, 951 F.2d 461, 464–65 (2d Cir.1991). In other words, the "intent to flee from prosecution or arrest may be inferred from a person's failure to surrender to authorities once he learns that charges against him are pending. This is true whether the defendant leaves the jurisdiction intending to avoid prosecution, or, having learned of charges while legally outside the jurisdiction, 'constructively flees' by deciding not to return."

*Bokhari*, 993 F. Supp. 2d at 938–39 (quoting *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984)). Further, to the extent Defendant is relying on *Hijazi*, this case is distinguishable because, as discussed above, Hijazi was a Lebanese citizen and resident of Kuwait, had no connections to the United States, and had surrendered to Kuwaiti authorities. 589 F.3d at 512.

As discussed above, Defendants have remained in Russia despite knowing they are wanted for prosecution in this district. They are U.S. citizens, own property in Virginia, and were in the

United States during the time frame of the alleged criminal conduct. They have purposely remained in Russia since the indictment was unsealed in September 2024 and have not surrendered themselves to U.S. or foreign authorities. They thus are functionally fugitives under any reasonable interpretation of the Doctrine.

### III.    This Court Should Apply the Fugitive Disentitlement Doctrine in This Case.

"The fugitive disentitlement doctrine is grounded in a court's power to control its own docket and proceedings." *Osipov*, 2024 WL 4367523 at *4 (quoting *Sec. & Exch. Comm'n v. Winburn*, No. 94-cv-00342, 1999 WL 151413, at *1 (D.C. Cir. Feb. 3, 1999); then citing *Daccarett-Ghia v. Internal Revenue Serv.*, 70 F.3d 621, 627 (D.C. Cir. 1995)). The Cout should apply the Doctrine to disentitle Defendants and not allow them to litigate any substantive issues in this case. As explained below, such an exercise of the Court's discretion would be appropriate here.

Several rationales support the Court's authority to dismiss motions by fugitive parties. *Osipov*, 2024 WL 4367523 at *4 (citing *Degen v. United States*, 517 U.S. 820, 824 (1996)). First, the judgment on review may be impossible to enforce. *Osipov*, 2024 WL 4367523 at *4 (citing *Degen*, 517 U.S. at 824). Judge Chutkan's opinion in *Osipov* is worth quoting here:

> To start, the [D]octrine's "first and foremost . . . concern" is "the enforceability of [the court's] decisions." *Martin v. Mukasey*, 517 F.3d 1201, 1204 (10th Cir. 2008) ("The rationale for the doctrine lies primarily in concern for the enforceability of a court's judgments[.]"). "Without [Osipov] present to accept the decision of this court" if it is adverse to him, "there is no guarantee that [the court's] judgment could be executed" because the case cannot proceed to trial in Osipov's continued absence. *Id.*; *see also Smith v. United States*, 94 U.S. 97, 97 (1876) ("It is clearly within our discretion to refuse to hear a criminal case [on appeal], *unless the convicted party . . . is where he can be made to respond to any judgment we may render*."

Osipov Op. & Order at 4 (emphasis in original); *see Dawkins v. Mitchell*, 437 F.2d 646, 647 (D.C. Cir. 1970) ("[I]f the ruling of this court were adverse to appellants, if their requested

relief was denied, then there is no assurance whatsoever that appellants will follow the command of the law as enunciated by this court."); *Shalhoub*, 855 F.3d at 1259 (describing the Doctrine as addressing "the difficulty of enforcement against one not willing to subject himself to the court's authority, the inequity of allowing a fugitive to use the resources of the courts only if the outcome is an aid to him, and the need to avoid prejudice to the nonfugitive party") (citations, internal quotation marks, and alterations omitted).

Second, by escaping or avoiding the court's jurisdiction, a fugitive defendant should not be allowed to avail himself or herself of the court's resources. As the Supreme Court has said, "[A]n appellant's escape 'disentitles' him 'to call upon the resources of the Court for determination of his claims.'" *Degen*, 517 U.S. at 824) (quoting  *Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970) (per curiam)).

Third, disentitlement under the Doctrine "discourages the felony of escape and encourages voluntary surrenders" and "promotes the efficient, dignified operation of the courts." *Osipov*, 2024 WL 4367523 at *4 (quoting *Degen*, 517 U.S. at 824 (quoting *Estelle v. Dorrough*, 420 U.S. 534, 537 (1975) (per curiam)) (internal quotation marks omitted). Further, application of the Doctrine is "appropriate if the fugitive's status in some way [has] prejudiced the government as a litigant by, *for example, delaying any retrial, in which time the memory of prosecution witnesses could fade*." *Daccarett-Ghia*, 70 F.3d at 623 (analyzing *Ortega-Rodriguez*, 507 U.S. 234) (emphasis added).

### A.  A Denial of Defendants' Motion to Dismiss Would Be Impossible to Enforce.

Defendants have not said that they will respect this Court's order if it rules against them on their motion and return to the United States to face justice for their alleged crimes. Indeed, Defendants have given every indication that they will not do so. In September 2024, soon after the

19

indictment, Defendant Dimitri Simes told a reporter for RT International, "If we have to come to the United States to contest the charges, then no, I am not in the least tempted to do so." Elena Chernenko, "'*Biden is out to get me': A Russian-American TV host facing 60 years in a US jail speaks out*," RT INTERNATIONAL (Sept. 9, 2024), available at https://www.rt.com/news/603734-biden-is-out-to-get-me/ (last accessed May 11, 2026).

Defendants appear to have the same view today. As Defendants aver in support of their motion, "The Indictment of the Simes has exiled an American journalist to the very country from which [Dimitri Simes] took refuge a half-century ago." Defs.' Mem. at 14. Defendants have not returned to the United States since October 2022 (Dimitri Simes) and April 2024 (Anastasia Simes) and now "reside[] openly in Moscow," Russia, Defs.' Mem. at 17, a country with which the United States does not have an extradition treaty, and which recently warned its nationals not to travel to countries that have extradition treaties with the United States. *See* https://www.reuters.com/world/russia-warns-citizens-not-travel-states-that-have-extradition-treaties-with-us-2026-04-01/ (last accessed on May 13, 2026). Moreover, Defendants show no concern over enforceability, contending, "There is no judgment to enforce if the Indictment is dismissed." *Id*. at 20. Defendants further contend that the government will "suffer no prejudice" if their motion is heard, because, if the government prevails, unspecified foreign governments may be more likely to extradite them. *Id*. at 22. Notably, Defendants do not say that, if the Court denies their motion, they will return to the United States, where they both hold citizenship and property, to face prosecution.

### B.  *Defendants Should Not Be Allowed to Call upon the Resources of This Court.*

As Judge Chutkan observed, "Such an unenforceable decision would 'threaten the dignity of the court' and would amount to a 'waste' of judicial time and resources." Osipov Op. & Order

at 4 (quoting *Degen*, 517 U.S. at 825). Accordingly, "application of the doctrine here would also promote judicial economy by freeing the court from giving what amounts to an advisory opinion that is unlikely to be enforced if the court rules against" Defendants. Osipov Op. & Order at 4 (quoting *Martirossian*, 917 F.3d at 890) (cleaned up). If Defendants "wish[] to use more of the court's time than [they] already [have], [they] must 'take the bitter with the sweet' and commit to accepting an adverse ruling." Osipov Op. & Order at 4 (quoting *Martirossian*, 917 F.3d at 889).

This Court is under no obligation to expend its time and resources only to have the Defendants ignore its decision. The government respectfully requests that the Court follow Judge Chutkan's ruling in *Osipov* and the majority position and decline to rule on the merits of Defendants' motion unless and until they submit themselves to its jurisdiction. *See Martirossian*, 917 F.3d at 889 ("[Defendant] has a readily available means of obtaining a ruling on his motion to dismiss the indictment. He can show up in the Southern District of Ohio, and the court as promised will decide his motion."); *Shalhoub*, 855 F.3d at 1263 ("That he does not want to submit himself to the jurisdiction of the federal courts does not make the legal remedies available to challenge his indictment inadequate."); *In re Kashamu*, 769 F.3d at 494 ("If he wants to fight the charges, he has only to fly from Lagos to Chicago[.]").

### C. *Application of the Doctrine Here Discourages Escape, Encourages Surrender, and Promotes the Dignity of the Courts.*

"In addition to promoting 'the efficient, dignified operation' of the court, application of the doctrine here would discourage evasion and 'encourage[] voluntary surrender.'" Osipov Op. & Order at 4-5 (quoting *Degen*, 517 U.S. at 824 (quoting *Dorrough*, 420 U.S. at 537)). By contrast, entertaining the merits of Defendants' motion to dismiss would encourage "'like-minded litigants' who wish to have their cake and eat it too." Osipov Op. & Order at 5 (quoting *Martin*, 517 F.3d at 1205).

This district has a large number of defendants who are foreign nationals, "often charged with serious offenses such as terrorism, proliferation of nuclear weapons, and election interference." Osipov Op. & Order at 5 (quoting *Osipov*, 2024 WL 4367523 at *5). The Court should not incentivize these defendants to file similar motions and "evade the court's jurisdiction all while saddling its docket with requests for advisory opinions." Osipov Op. & Order at 5. As Judge Chutkan concluded, "the rationales underlying the fugitive disentitlement doctrine strongly support its application here." *Id*.[6]

---

[6] The cases cited by Defendants as to why their presence is unnecessary, *see* Defs.' Mem. at 18-21, are inapposite. In *Daccarett-Ghia*, 70 F.3d 621, the petitioner, who was seeking a redetermination of his U.S. taxes, had failed to appear in an unrelated federal criminal case filed in the District of New Jersey. *Id*. at 622. As the D.C. Circuit reasoned, "Appellant's presence was in no way required at the Tax Court's proceedings; for example, he would be perfectly free to pursue his Petition for Redetermination as a foreign national residing outside of the United States." *Id*. at 627. Here, Defendants' presence is required in the criminal prosecution. *See, e.g.*, Fed.R.Crim.P. 5. It cannot move forward without their presence, and their fugitive status is delaying any progress in this case. Similarly, *Ajaka v. Gacki*, 557 F. Supp. 3d 45 (D.D.C. 2021), concerned a claim by persons alleging their designation as "Specially Designated Nationals" by OFAC deprived them of due process and was arbitrary and capricious in violation of the Administrative Procedures Act. And, *Lazaridis v. U.S. Dep't of Just.*, 713 F. Supp. 2d 64 (D.D.C. 2010), was an action under the Freedom of Information Act.

Defendants' reliance on *United States v. Noriega*, 683 F. Supp. 1373, 1375 (S.D. Fla. 1988), is also misplaced. Neither Defendant is "the *de facto* head of a foreign government indicted for using his position to commit the crimes alleged." *Cf. id*. at 1374.

## CONCLUSION

For the foregoing reasons, the Government respectfully opposes the Defendant's Motion and requests that it be denied without prejudice.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY


By:  */s/Jolie F. Zimmerman*
Jolie F. Zimmerman
D.C. Bar No. 465110
Assistant United States Attorney
National Security Section
601 D Street, N.W.
Washington, D.C.  20530
(202) 252-7220
jolie.zimmerman@usdoj.gov